IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

Darci Forrester and Keith Forrester, )
individually; C.F., a minor child, by and through )
his parents and next friends, Darci Forrester )
and Keith Forrester, )
 )
    Plaintiffs, )
 ) Case No. <u>6:16-cv-00131</u>
v. )
 )
INDEPENDENT SCHOOL DISTRICT ) **JURY TRIAL DEMANDED**
NO. 19 OF CARTER COUNTY, STATE ) **ATTORNEYS' LIEN CLAIMED**
OF OKLAHOMA, a/k/a Ardmore City Schools, )
a political subdivision, )
 )
    Defendant. )

## **COMPLAINT**

Plaintiffs Darci Forrester and Keith Forrester, individually, and C.F., a minor child, by and through his parents and next friends, Darci and Keith Forrester, for their causes of action against Defendant Independent School District No. 19 of Carter County, State of Oklahoma, a/k/a Ardmore City Schools ("ACS"), allege and state as follows:

The Parties

1. Darci Forrester and Keith Forrester (the "Parents") are the parents of C.F., a minor child. They reside together in Carter County, City of Ardmore, State of Oklahoma.

2. C.F. is a severely disabled ten-year old boy, who has been diagnosed with Autism and Severe Receptive Expressive Language Disorder. His disabilities include a present inability to communicate verbally, and he has an estimated I.Q. of 44. C.F. is a

1

resident of the ACS school district and has been enrolled in Defendant's school district for a number of years.

3. C.F. is a "qualified individual with a disability" within the meaning of the Americans with Disabilities Act of 1990 ("ADA") and the Americans with Disabilities Act Amendments Act of 2008 (the "ADAAA") with respect to the services, programs, and activities of Defendant ACS.

4. C.F. is an "otherwise qualified individual with a disability" within the meaning of Section 504 of the Rehabilitation Act of 1974 with respect to the benefits, programs, and activities of ACS.

5. Defendant ACS operates the public schools in Carter County, City of Ardmore, State of Oklahoma, including Charles Evans Elementary School ("Charles Evans"). Defendant ACS is a political subdivision of the State of Oklahoma.

6. ACS is a "public entity" within the meaning of the ADA. ACS as well as the services, programs, and activities implicated herein receive federal financial assistance within the meaning of 29 U.S.C. §§ 794 and 794a.

## Jurisdiction and Venue

7. This Court has personal jurisdiction over ACS because ACS is a political subdivision of the State of Oklahoma.

8. This Court has subject matter jurisdiction over Plaintiffs' claims because Plaintiffs' claims under the ADA, ADAAA, and Section 504 arise under federal law. Additionally, Plaintiffs claim for declaratory judgment with regard to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2511 *et seq.* ("Title

III"), arises under federal law. The Court has supplemental jurisdiction over Plaintiffs' claim for declaratory judgment with regard to the Oklahoma Security of Communications Act, 13 O.S. § 176.1 *et seq.* ("SCA"). 28 U.S.C. §§ 1331 and 1367.

9.      Venue is proper in this Court because Plaintiffs' claims arose in the Eastern District of Oklahoma.

## Factual Allegations

10.     At the age of two, C.F. was diagnosed with Autism and Severe Receptive Expressive Language Disorder by Dr. Laura McGuinn at the University of Oklahoma Health Sciences Center Department of Pediatrics Child Study Center.

11.     Because of his disabilities, C.F. now and at all relevant times has been primarily non-verbal and cannot communicate with words. In order to verbally communicate his needs and wants, C.F. must use an Augmentative and Alternative Communication Device ("AACD"). The parties colloquially refer to C.F.'s AACD as his "Talker."

12.     During C.F.'s Second (2013-2014), Third (2014-2015), and Fourth (2015-2016) years, ACS had a duty and obligation to provide C.F. with certain services, programs, and/or activities (the "Services"). These Services included, but were not limited to, social interactions with his typically-developed and disabled peers.

13.     During the course of C.F.'s Second, Third, and Fourth Grade years, Parents gradually began to develop concerns about C.F.'s school environment, specifically including concerns about how C.F. was being treated by ACS teachers and staff relating to his physical and emotional health and well-being.

3

14. In the Spring semester of C.F.'s Third Grade Year, Parents retained an attorney to assist them in dealing with ACS in light of their growing worries and concerns over C.F.'s treatment at school. After requesting records from ACS pursuant to the Family Educational Rights and Privacy Act ("FERPA") and the Oklahoma Open Records Act ("ORA"), Parents received C.F.'s school file for the first time.

15. After reviewing the school file, Parents learned for the very first time that ACS personnel had "secluded" C.F. in January of 2013 by locking him in a closet. The seclusion of students with disabilities is a highly restricted process that can only occur in limited situations with staff members who are appropriately trained to use seclusion techniques. In addition, the law requires school districts to notify parents of any seclusion incident immediately after it occurs.

16. ACS did not ever notify Parents, or either of them, about the January 2013 seclusion incident.

17. After learning of the seclusion incident for the first time in the summer of 2015, Parents set out to obtain evidence about what was happening to C.F. during the course of his school day. They did this by recording C.F.'s school day through the use of his Talker.

18. The Talker is an electronic tablet with a protective coating that has specially designed software that assists C.F. with communication and interaction.

19. Parents use of the Talker was reasonably calculated to record only the conversations and events taking place in a public school classroom setting and in the

presence of their son, as C.F. was required to have his Talker with him at all times during the school day.

20. Parents had a good faith and objectively reasonable basis for believing that it was necessary and in the best interests of C.F. to consent on behalf of C.F. to such recording. Such recording is lawful and appropriate has parents have the legal authority to vicariously consent on behalf of their minor children to record conversations.

21. Additionally, all recordings took place in a public school classroom setting, and no person in such a setting has a reasonable expectation of privacy.

22. On the days the recordings were made, C.F. was taken directly to the "Sensory Room" at Charles Evans Elementary School where he stayed almost all day with two paraprofessionals. C.F. was thus isolated from his disabled and typically-developed peers almost all day while he was at school. The impact of social isolation on C.F.'s social and emotional development has been severe and significant.

23. On the days the recordings were made, ACS staff are heard to call C.F. a "bastard," state that they do not want to work with him, and that he has driven off a number of teachers. Additionally, ACS staff mock C.F.'s disability openly amongst themselves.

24. The Principal of Charles Evans Elementary School, Denise Brunk, was aware that C.F. was being taken to the Sensory Room and isolated from his disabled and typically-developed peers on a regular and daily basis for at least two years.

25. After Parents retained an attorney and began to engage in protected opposition to what they reasonably and in good-faith perceived to be disability discrimination, ACS personnel began prohibiting Darci Forrester from entering the

elementary school building by meeting her at the door to escort C.F. to his classroom. Prior to Parents' protected opposition, Darci Forrester was allowed to escort C.F. to his classroom.

26. In addition to creating a "Forrester Drop Off Procedure," ACS mandated that C.F.'s teachers and staff members tell Darci Forrester, in response to any question she asked, that they "did not know" the answer. This is reflected in ACS' internal emails, wherein one staff member states that "I am following the protocol of saying 'I don't know,' but [C.F.'s] mom continues to question us."

27. ACS does not use have a "Drop Off Procedure" or a protocol of saying "I don't know" for any other parent at ACS other than Plaintiffs, because Plaintiffs engaged in protected opposition to unlawful disability discrimination.

28. In October of 2015, Parents learned that C.F.'s special education teacher had left the employment of ACS. ACS replaced the special education teacher with Amanda Bristow. When Parents received Ms. Bristow's name, they conducted an internet search relating to her background. They discovered that Ms. Bristow had pleaded no contest to multiple felony counts of child abuse in August of 2015.

29. Parents informed ACS administration of this fact but the administration doubled-down in its decision to hire Ms. Bristow by sending out a letter stating that ACS conducts a proper search with due diligence and considers student safety of paramount importance.

30. On the same date that ACS sent out the letter described above, one of C.F.'s paraprofessionals wrote in her notes that Bristow physically restrained another child—not C.F.—in the special education classroom in a way that made her feel "uncomfortable."

31. On December 17, 2015, the Oklahoma State Department of Education suspended Ms. Bristow's teaching license on an emergency basis and invoked individual proceedings to permanently remove her license.

32. In direct response to Parents' complaints about the different and unlawful treatment of C.F. on the basis of his disability, ACS Superintendent Sonny Bates and Assistant Superintendent Missy Storm made a false police report to the Ardmore Police Department regarding the video recordings obtained by Parents through C.F.'s Talker.

33. In the police report, Bates and Storm stated that ACS did not learn about the recordings until November 2015. However, ACS personnel signed statements dated September 29, 2015 acknowledging that the Talker "had been set up to take spontaneous videos along with audio recordings continuously throughout the entire day." ACS personnel informed Principal Denise Brunk and Director of Special Education Carolyn Thomas about the video and audio recordings on that date.

34. ACS thus made a knowingly false police report through its Superintendent Sonny Bates and Assistant Superintendent Missy Storm. In addition, ACS's filing of a police report *at all* constituted an intentional attempt to retaliate against Parents for their protected opposition in the form of complaining about disability discrimination.

35. In November 2015, Parents filed an administrative due process complaint with the Oklahoma State Department of Education under the Individuals with Disabilities

7

Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"). In the administrative proceeding, ACS has asked that that Hearing Officer determine that the audio-video recordings obtained through C.F.'s Talker be excluded as evidence on the basis that the recordings were obtained in violation of Title III and the SCA, *supra*.

36. The Hearing Officer has refused to make such a decision and has authorized the parties to obtain a judicial ruling on the issue of whether or not the audio-video recordings are unlawful wiretaps.

## PLAINTIFFS' FIRST CAUSE OF ACTION – Section 504

37. Plaintiffs incorporate by reference herein paragraphs 1-36 as though set forth in full herein.

38. Section 504 of the Rehabilitation Act provides that, "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

39. By the acts and failures of ACS administrators, staff, and personnel, ACS intentionally excluded C.F. from participation in and/or denied him the benefits of the services, programs and/or activities of ACS, including but not limited to the services described above. Such exclusions and/or denials were solely by reason of C.F.'s disability and were in violation of Section 504.

40. ACS did not and does not seclude non-disabled children or isolate non-disabled children from their peers on a frequent, regular and daily basis.

41. By the acts and failures of ACS administrators, staff, and personnel, ACS otherwise subjected C.F. to discrimination under programs and activities of ACS, including but not limited to the services described above. Such discrimination was solely by reason of C.F.'s disability and was in violation of Section 504.

42. ACS intentionally and with deliberate indifference discriminated against C.F. on the basis of his disability. ACS's administrative staff were aware of the difference in treatment between C.F. and his non-disabled peers by virtue of their daily involvement and familiarity with the school setting. However, ACS's administrative staff deliberately ignored the discrimination and intentionally allowed it to be perpetuated for a period of at least two years, such that C.F. was isolated from his peers on a daily basis.

43. Because of the close parental relationship between C.F. and Parents, and because of Parents' obligations to ensure that C.F. receives an appropriate upbringing, Parents have independent standing to seek compensatory damages for ACS's violations of Section 504. See, e.g., A.M. ex rel. J.M. v. NYC Dept. of Educ., 840 F.Supp.2d 660, 675 (E.D.N.Y. 2012) (recognizing that "[t]he majority of courts" have held parents have independent standing to seek compensatory damages under Section 504).

44. As the direct and proximate result of violating Section 504, ACS caused C.F. and Parents to suffer the injuries and losses described above, and caused C.F. and Parents to suffer a loss of rights guaranteed by Section 504.

45. As the entity held accountable for violations of Section 504, ACS is liable for all of said injuries and losses caused by its employees and/or agents.

PLAINTIFFS' SECOND CAUSE OF ACTION – Title II of the ADA/ADAAA

46. Plaintiffs incorporate by reference herein paragraphs 1-45 as though set forth in full herein.

47. The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." See 42 U.S.C. § 12132.

48. By the acts and failures of ACS administrators, teachers, staff, and other personnel, ACS excluded C.F. from participation in, and denied C.F. the benefits of, the services, programs, and/or activities of ACS, including but not limited to the services described above. Such exclusion and denial were by reason of C.F.'s disability.

49. ACS intentionally and with deliberate indifference discriminated against C.F. on the basis of his disability. ACS's administrative staff were aware of the difference in treatment between C.F. and his non-disabled peers by virtue of their daily involvement and familiarity with the school setting. However, ACS's administrative staff deliberately ignored the discrimination and intentionally allowed it to be perpetuated for a period of at least two years, such that C.F. was isolated from his peers on a daily basis. ACS did not and does not seclude non-disabled children or isolate non-disabled children from their peers on a frequent, regular and daily basis.

50. Because of the close parental relationship between C.F. and D.F. and K.F., and because of D.F. and K.F.'s obligations to ensure that C.F. receives an appropriate upbringing, D.F. and K.F. have independent standing to seek compensatory damages for

ACS's violations of Title II of the ADA. See, e.g., A.M. ex rel. J.M. v. NYC Dept. of Educ., 840 F.Supp.2d 660, 675 (E.D.N.Y. 2012) (recognizing that "[t]he majority of courts" have held parents have independent standing to seek compensatory damages under Section 504).

51.     As the direct and proximate result of violating Title II of the ADA, ACS caused C.F., D.F, and K.F. to suffer the injuries and losses described above, and caused C.F., D.F., and K.F. to suffer a loss of rights guaranteed by Section 504.

52.     As the entity held accountable for violations of Title II of the ADA, ACS is liable for all of said injuries and losses caused by its employees and/or agents.

THIRD CAUSE OF ACTION – Retaliation in Violation of ADA/ADAAA

53.     Plaintiffs incorporate by reference herein paragraphs 1-45 as though set forth in full herein.

54.     The ADA imposes a duty on ACA not to engage in retaliation or coercion against D.F. and K.F. Specifically, 42 U.S.C. § 12203 provides:

> (a) Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act.
>
> (b) Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this Act.

55.     By the acts and omissions of ACS administrators, teachers, staff, and other personnel, ACS violated the foregoing provisions of the ADA by retaliating against D.F. and K.F. and/or by engaging in prohibited interference, coercion and/or intimidation as set out and described above.

56. As the entity held accountable for violations of the ADA, ACS is liable for all of said injuries and losses.

FOURTH CAUSE OF ACTION – Declaratory Judgment Under 28 U.S.C. § 2201

57. Plaintiffs incorporate by reference herein paragraphs 1-56 as though set forth in full herein.

58. An actual controversy and dispute has arisen by and between Plaintiffs and Defendant ACS in that Plaintiffs contend and assert that:

  (a) Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2511 *et seq.* ("Title III") makes it unlawful in certain circumstances to intercept "oral communications," subject to certain exceptions;

  (b) Title III's definition of "oral communications" is intended to parallel the "reasonable expectation of privacy" test articulated by the United States Supreme Court in *Katz v. United States*, 389 U.S. 347 (1967);

  (c) Public school employees do not have a reasonable expectation of privacy in their communications in public school classrooms;

  (d) Parents have the right to vicariously consent to the recording of conversations to which their children are parties;

  (e) Parents, in this case, had a good-faith and objectively reasonable basis for recording C.F.'s shortened school day, because it was in his best interests;

  (f) Parents did not violate Title III and the recordings are admissible in any proceeding, including the administrative due process proceeding and the proceeding before this Court.

59. On the other hand, Defendant ostensibly asserts and contends to the contrary.

60. This claim is brought pursuant to 28 U.S.C. § 2201 and Title III to determine and adjudicate the actual controversy and dispute that has arisen between Plaintiffs and Defendant.

61. Plaintiffs request and seek a judgment determining and declaring as follows:

(a) Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2511 *et seq.* ("Title III") makes it unlawful in certain circumstances to intercept "oral communications," subject to certain exceptions;

(b) Title III's definition of "oral communications" is intended to parallel the "reasonable expectation of privacy" test articulated by the United States Supreme Court in *Katz v. United States*, 389 U.S. 347 (1967);

(c) Public school employees do not have a reasonable expectation of privacy in their communications in public school classrooms;

(d) Parents have the right to vicariously consent to the recording of conversations to which their children are parties;

(e) Parents, in this case, had a good-faith and objectively reasonable basis for recording C.F.'s shortened school day, because it was in his best interests;

(f) Parents did not violate Title III and the recordings are admissible in any proceeding, including the administrative due process proceeding and the proceeding before this Court.

FIFTH CAUSE OF ACTION – Declaratory Judgment Under 12 O.S. § 1651

62. Plaintiffs incorporate by reference herein paragraphs 1-61 as though set forth in full herein.

63. An actual controversy and dispute has arisen by and between Plaintiffs and Defendant ACS in that Plaintiffs contend and assert that:

  (a)  The Oklahoma Security of Communications Act, 13 O.S. § 176.1 *et seq.* (the "SCA") makes it unlawful in certain circumstances to intercept "oral communications," subject to certain exceptions;

  (b)  The SCA's definition of "oral communications" is intended to parallel the "reasonable expectation of privacy" test articulated by the United States Supreme Court in *Katz v. United States*, 389 U.S. 347 (1967);

  (c)  Public school employees do not have a reasonable expectation of privacy in their communications in public school classrooms;

  (d)  Parents have the right to vicariously consent to the recording of conversations to which their children are parties;

  (e)  Parents, in this case, had a good-faith and objectively reasonable basis for recording C.F.'s shortened school day, because it was in his best interests;

  (f)  Parents did not violate the SCA and the recordings are admissible in any proceeding, including the administrative due process proceeding and the proceeding before this Court.

64. On the other hand, Defendant ostensibly asserts and contends to the contrary.

65. This claim is brought pursuant to 12 O.S. § 1651 and the SCA to determine and adjudicate the actual controversy and dispute that has arisen between Plaintiffs and Defendant.

66. Plaintiffs request and seek a judgment determining and declaring as follows:

  (a)  The Oklahoma Security of Communications Act, 13 O.S. § 176.1 *et seq.* (the "SCA") makes it unlawful in certain circumstances to intercept "oral communications," subject to certain exceptions;

  (b)  The SCA's definition of "oral communications" is intended to parallel the "reasonable expectation of privacy" test articulated by the United States Supreme Court in *Katz v. United States*, 389 U.S. 347 (1967);

  (c)  Public school employees do not have a reasonable expectation of privacy in their communications in public school classrooms;

(d) Parents have the right to vicariously consent to the recording of conversations to which their children are parties;

(e) Parents, in this case, had a good-faith and objectively reasonable basis for recording C.F.'s shortened school day, because it was in his best interests;

(f) Parents did not violate the SCA and the recordings are admissible in any proceeding, including the administrative due process proceeding and the proceeding before this Court.

### Prayer for Relief

WHEREFORE, Plaintiff C.F., by and through his parents and next friends, Darci Forrester and Keith Forrester, and Darci Forrester and Keith Forrester, individually, respectfully request that this Court grant the following relief:

1. Declare that ACS has violated C.F.'s rights under Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) and the anti-discrimination provisions of the ADA/ADAAA (42 U.S.C. § 12132);

2. Declare that ACS has violated Parents' rights under Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) and the anti-discrimination provisions of the ADA (42 U.S.C. § 12132);

3. Declare that ACS has violated Parents' rights under the anti-retaliation and anti-interference provisions of the ADA (42 U.S.C. § 12203);

4. Grant C.F. an award of compensatory damages against ACS in a sum sufficient to compensate him for his injuries and losses, plus pre-judgment and post-judgment interest on such an award;

5. Grant C.F. an award of punitive damages against ACS for their intentional and malicious actions as described herein;

6. Grant Parents an award of compensatory damages against ACS in a sum sufficient to compensate them for their separate injuries and losses, plus pre-judgment and post-judgment interest on such an award;

7. Grant Parents an award of punitive damages against ACS for their intentional and malicious actions as described herein;

8. Grant C.F. and Parents an award of expert fees and attorneys' fees against ACS as provided by 29 U.S.C. § 794a(b), 42 U.S.C. § 12203(c), 42 U.S.C. § 1988(b) and (c), and other applicable law;

9. Declare that Plaintiffs have not violated Title III or the SCA and that the audio-video recordings are admissible in any proceeding as delineated in the Fourth and Fifth Causes of Action, above; and

10. Grant C.F. and Parents such further relief as this Court deems just, equitable and appropriate.

    WARD & GLASS, L.L.P.
/s/ Barrett T. Bowers
Stanley M. Ward, OBA#9351
Woodrow K. Glass, OBA#15690
R. Ben Houston, OBA#14751
Brent L. Neighbors, OBA#15910
Barrett T. Bowers, OBA#30493
Bryan B. Young, OBA#31434
1601 36th Ave. NW, Ste. 100
Norman, Oklahoma 73072
(405) 360-9700
(405) 360-7902 (fax)
**ATTORNEYS FOR PLAINTIFFS**